IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**POTOMAC RIVERKEEPER, INC. and**
**THE SIERRA CLUB,**

        **Plaintiffs,**

  v.                                                       **CIVIL NO. 2:21-CV-23**
                                                                          **(KLEEH)**

**VIRGINIA ELECTRIC AND POWER**
**COMPANY,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO DISMISS [ECF NO. 4]

Pending before the Court is a motion to dismiss for lack of subject matter jurisdiction [ECF No. 4]. For the reasons discussed herein, the Court **DENIES** the motion.

### I.    FACTUAL BACKGROUND

This is a citizen suit under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et. seq. (the "Clean Water Act"). The Plaintiffs, Potomac Riverkeeper, Inc. and the Sierra Club (together, "Plaintiffs"), allege that the Defendant, Virginia Electric and Power Company ("VEPCO"), has violated the conditions of its National Pollutant Discharge Elimination System Permit (the "NPDES Permit")[1] at the Mount Storm Power Station in Mount Storm, West Virginia.

---

[1]. The NPDES Permit, Permit No. WV0005525, is in effect until December 15, 2024. Compl., ECF No. 1, at ¶ 22.

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO DISMISS [ECF NO. 4]**

VEPCO is a wholly-owned subsidiary of Dominion Energy, Inc. See Compl., ECF No. 1, at ¶ 7. Potomac Riverkeeper, Inc. is a non-profit organization whose goal is "to protect the public's right to clean water in our rivers and streams, stop pollution, promote safe drinking water, protect healthy river habitats, and enhance public use and enjoyment." Id. ¶ 9. The Sierra Club is a nonprofit organization "dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives." Id. ¶ 10. Plaintiffs have sued on behalf of their member, Vincent Meehan. Id. ¶ 11.

Dominion created Mount Storm Lake in 1963 as an impoundment of the Stony River to provide cooling water for the Mount Storm Power Station. Id. ¶ 23. WVDEP considers Mount Storm Lake to be an industrial impoundment, as opposed to a "water of the United States," so Mount Storm Lake is not regulated by the Clean Water Act. Id. As a result, water-quality effluent limitations are imposed at Outlet 001, which is the dam spillway from Mount Storm Lake into the lower Stony River. Id. The Stony River is a tributary of the North Branch of the Potomac River. Id. ¶ 24.

The NPDES Permit requires that at Outlet 001, the temperature

difference between upstream and downstream waters may not exceed 5 degrees Fahrenheit. Id. ¶ 25. The temperature must be measured at least once per week. Id. VEPCO has reported temperature differences at Outlet 001 that exceed its permit limitations. Id. ¶ 31 (report is attached to Complaint as Appendix). Further, VEPCO was only measuring the temperature once per month instead of the required once per week. Id. ¶ 32.

WVDEP has issued two administrative orders to VEPCO that contain compliance schedules. Id. ¶ 27. The first, Order No. 6291, was extended multiple times with a final compliance deadline of July 31, 2015. Id. The second, Order No. 8240, was extended multiple times with a final compliance deadline of March 31, 2023. Id. It is undisputed that the orders are not administrative penalty orders under 33 U.S.C. § 1319(g)(6). Id. ¶ 30.

Plaintiffs allege that since at least January 2016, VEPCO has violated its NPDES Permit and failed to report all of its violations. Id. ¶¶ 34, 35. They assert that VEPCO is engaging in continuing and/or intermittent violations of the Clean Water Act. Id. ¶ 37. Plaintiffs argue that VEPCO is liable for civil penalties of up to $56,460 for each violation that occurred after November 2, 2015, and is also subject to an injunction. Id. ¶¶ 38, 39.

Plaintiffs ask the Court for the following relief:

MEMORANDUM OPINION AND ORDER
DENYING MOTION TO DISMISS [ECF NO. 4]

- Declare that VEPCO has violated and is in continuing violation of the Clean Water Act;

- Enjoin VEPCO from operating the Mount Storm Power Station in such a manner that will result in further violations of the NPDES Permit;

- Order VEPCO to immediately comply with the effluent limit for upstream/downstream temperature different and the reporting requirements in the NPDES Permit;

- Order VEPCO to conduct monitoring and samples to determine the environmental effects of the violations, to remedy and repair adverse environmental effects and/or degradation caused by its violations, and restore the environment to its prior unpolluted condition;

- Order VEPCO to pay an appropriate civil penalty of up to $56,350 per day for each violation;

- Award Plaintiffs their attorneys' fees, expert witness fees, and other reasonable costs and expenses; and

- Grant such other relief as the Court deems just and proper.

## II.  PROCEDURAL HISTORY

Plaintiffs filed the Complaint on September 8, 2021. VEPCO file a motion to dismiss on November 1, 2022. The motion is fully briefed and ripe for review. The Court heard arguments on the motion on May 16, 2022.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows the Court to dismiss an action for lack of jurisdiction over the subject matter.

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO DISMISS [ECF NO. 4]**

A plaintiff bears "the burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). In considering a motion to dismiss pursuant to Rule 12(b)(1), a court should "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Id. (citation omitted). A court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (citation omitted). When a defendant asserts multiple defenses, "questions of subject matter jurisdiction must be decided 'first, because they concern the court's very power to hear the case.'" Owens-Illinois, Inc. v. Meade, 186 F.3d 435, 442 n.4 (4th Cir. 1999).

### IV.  DISCUSSION

VEPCO has moved to dismiss the Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. VEPCO argues that Plaintiffs lack standing. Alternatively, if the Court finds that Plaintiffs have standing, VEPCO believes the Court should exercise its discretion not to hear the case under the Burford abstention doctrine. The Court disagrees and will address each argument in turn.

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO DISMISS [ECF NO. 4]

**A.   Standing**

To establish Article III standing, "(1) the plaintiff must have suffered an injury-in-fact, which (2) must be causally connected to the conduct complained of, and that (3) will likely be redressed if the plaintiff prevails." Baehr v. Creig Northrop Team, P.C., 953 F.3d 244, 252 (4th Cir. 2020) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). "In the environmental litigation context, the standing requirements are not onerous." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 517 (4th Cir. 2003).

**1.   Injury-in-Fact**

To establish an injury-in-fact, a plaintiff must "show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 332 (2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way," and it is concrete if is "'de facto'; that is, it must actually exist." Id. at 339-40 (citations omitted).

Injury-in-fact is an easy standard to meet for a plaintiff in an environmental case. As the United States Court of Appeals for the Fourth Circuit has explained,

> In an environmental case, the question is whether the plaintiff has suffered an injury, as opposed to whether the environment has actually been harmed. See Laidlaw, 528 U.S. at 181, 120 S.Ct. 693. Specifically, a plaintiff need only show that he used the affected area, and that he is an individual "for whom the aesthetic and recreational values of the area [are] lessened" by the defendant's activity. Sierra Club v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); see also Laidlaw, 528 U.S. at 184, 120 S.Ct. 693 (holding that plaintiffs had established an injury in fact because the challenged activity directly affected their "recreational, aesthetic, and economic interests"); Defenders of Wildlife, 504 U.S. at 562-63, 112 S.Ct. 2130 ("[T]he desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for the purpose of standing."); Gaston Copper, 204 F.3d at 159 (concluding that individuals' allegations that they would make greater recreational use of waterway except for concern over defendant's discharges sufficient for injury in fact).

Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., 268 F.3d 255, 263 (4th Cir. 2001).

In Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2000), the Supreme Court held that standing existed in an environmental citizen suit when affiants desired to use an affected area but had not previously used it. The Court cited sworn statements that constituted injury-in-fact, including but not limited to the following:

> Judy Pruitt averred that she lived one-quarter mile from Laidlaw's facility and would like to

> fish, hike, and picnic along the North Tyger River, but has refrained from those activities because of the discharges.
>
> . . .
>
> Linda Moore attested that she lived 20 miles from Roebuck, and would use the North Tyger River south of Roebuck and the land surrounding it for recreational purposes were she not concerned that the water contained harmful pollutants. In her deposition, Moore testified at length that she would hike, picnic, camp, swim, boat, and drive near or in the river were it not for her concerns about illegal discharges.
>
> . . .
>
> Norman Sharp averred that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants.

Id. at 182–83 (citations to the record omitted). With respect to some of the affiants' statements that they "would" use the area if not for pollution, the Court wrote,

> Nor can the affiants' conditional statements — that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it — be equated with the speculative "'some day' intentions" to visit endangered species halfway around the world that we held insufficient to show injury in fact in Defenders of Wildlife, 504 U.S. at 564.

Id. at 184.

Justice Scalia dissented and described his concerns with what he perceived to be an inappropriate expansion of the standing doctrine:

> Linda Moore, for example, said in her affidavit that she would use the affected waterways for recreation if it were not for her concern about pollution. Yet she testified in her deposition that she had been to the river only twice, once in 1980 (when she visited someone who lived by the river) and once after this suit was filed. Similarly, Kenneth Lee Curtis, who claimed he was injured by being deprived of recreational activity at the river, admitted that he had not been to the river since he was "a kid," and when asked whether the reason he stopped visiting the river was because of pollution, answered "no[.]"
>
> . . .
>
> The other affiants cited by the Court were not deposed, but their affidavits state either that they *would* use the river if it were not polluted or harmful (as the court subsequently found it is not), or said that the river looks polluted (which is also incompatible with the court's findings). These affiants have established nothing but "subjective apprehensions."
>
> . . .
>
> Although we have previously refused to find standing based on the "conclusory allegations of an affidavit," Lujan v. National Wildlife Federation, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the Court is content to do just that today. By accepting plaintiffs' vague, contradictory, and unsubstantiated allegations of "concern" about the environment as adequate to prove

> injury in fact, and accepting them even in the face of a finding that the environment was not demonstrably harmed, the Court makes the injury-in-fact requirement a sham.

Id. at 200-201 (Scalia, J., dissenting). The Eleventh Circuit has articulated the Laidlaw holding as finding that

> plaintiffs who alleged that they "would [have] like[d] to" have engaged in certain recreational activities but did not because of the defendant's alleged conduct had standing, Friends of the Earth, 528 U.S. at 181-83, 120 S.Ct. 693, even though they had never used the affected area or had done so only once or twice years before, id. at 200, 120 S.Ct. 693 (Scalia, J., dissenting).

Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC, 26 F.4th 1235, 1241-42 (11th Cir. 2022).

Here, Plaintiffs allege that standing exists through organizational member Vincent Meehan. The Complaint alleges that Mr. Meehan has been impacted by VEPCO's violations in the following ways:

- He uses, enjoys, and benefits from the water quality in Mount Storm Lake, the Stony River, and the North Potomac River;

- He regularly visits the Mount Storm area;

- He fishes for bass in Mount Storm Lake around four times per year;

- He frequently fishes in the North Branch of the Potomac River, downstream from the Mount Storm Lake;

- He would like to fish for walleye in Mount Storm Lake and walleye and/or trout in the Stony River but is concerned that excessive heat in the water discharged from the Mount Storm Power Station could negatively affect the presence, abundance, and/or health of such species, thereby reducing his enjoyment in and chances of catching them;

- If VEPCO complied with its permit and its excessive heat violations were reduced or eliminated, the risk of such adverse effects may be reduced;

- He would benefit from any decreased risk of adverse effects on the fishery in Mount Storm Lake, the Stony River, and the North Branch of the Potomac River; and

- He would like to fish in the Stony River if the temperature discharged into it from Mount Storm Lake were better controlled.

VEPCO argues that Plaintiffs have not established an injury-in-fact because they have failed to specify that they use an affected area. The West Virginia Department of Environmental Protection ("WVDEP"), the West Virginia Division of Natural Resources ("WVDNR"), and the United States Environmental Protection Agency ("EPA") have recognized for years that the thermal component of Mount Storm's discharge reaches only to the Route 50 bridge, which is eight miles downstream from Outlet 001. The Complaint fails to allege precisely where Mr. Meehan fishes. The North Branch is a major river — over 100 miles long — and most of it is downstream from Mount Storm. Even if Mr. Meehan fished

at the mouth of the Stony River, where it enters the North Branch, that would be over 14 miles downstream from Mount Storm, which is beyond its thermal component.

Further, VEPCO argues, Plaintiffs do not specify where in the Stony River Mr. Meehan would like to fish, so it is impossible to confirm if the portions of the river are impacted by the thermal component of Mount Storm's discharges. The Stony River is at least 18 miles long, and it includes stretches upstream and downstream from Mount Storm. Any stretch that is upstream from Mount Storm is clearly not impacted by Mount Storm's thermal component and cannot support injury-in-fact, and only a portion of the river's downstream is impacted by Mount Storm's thermal component.

In response, Plaintiffs submitted an affidavit from Mr. Meehan that identifies the locations where he fishes and would like to fish. Mr. Meehan estimates that he fishes in the North Branch within 30 miles of the discharge from Mount Storm. See Response, Exh. F (Meehan Decl.), ECF No. 9-6, at ¶ 7. He fishes on Mount Storm Lake around four times per year. Id. ¶ 13. If the Mount Storm Power Station were forced to comply with its temperature limitations, Mr. Meehan "would absolutely fish in the Stony River," including the portion between Outlet 001 and the Route 50 bridge, which is within Mount Storm's thermal component. Id. ¶ 17. Plaintiffs do not dispute VEPCO's representation that

the thermal component of Mount Storm reaches only to the Route 50 bridge (eight miles south of Outlet 001).

Because the parties agree as to the reach of Mount Storm's thermal component, the affected area at issue is the eight-mile stretch of the Stony River between Outlet 001 and the Route 50 bridge. The North Branch is beyond the thermal component, and Mount Storm Lake itself is not subject to the NPDES permit.

VEPCO correctly points out that Plaintiffs have not alleged that Mr. Meehan used any of the eight-mile stretch of the Stony River to fish. He simply desires to. VEPCO argues that this is not sufficient to confer standing. Contrary to VEPCO's arguments, according to <u>Laidlaw</u>, a desire to use the portion of the river is sufficient to establish injury-in-fact. Mr. Meehan fishes in the area surrounding the eight-mile stretch of the Stony River, and he has sworn that if not for the pollution, he "absolutely" would fish there as well. Injury-in-fact exists because Mr. Meehan would <u>like</u> to fish in the affected area of the Stony River — between Mount Storm and the Route 50 bridge — but does not due so due to the alleged pollution.

### 2. Traceability

To establish traceability, the Fourth Circuit has explained that "a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries

alleged in the specific geographic area of concern." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000) (citation omitted).

With respect to traceability, the parties reassert the same arguments they asserted regarding injury-in-fact. For the same reasons discussed above, traceability exists. The injury cited by Plaintiffs is the inability to fish in the eight-mile stretch of the Stony River that is impacted by Mount Storm's discharge. As the Court held in Laidlaw, Mr. Meehan's desire to fish there is sufficient to establish injury-in-fact even if he has never actually fished there. The heat discharged from Mount Storm Power Station contributes to his injury (his inability to fish there).

3. **Redressability**

The burden imposed by the redressability requirement "is not onerous." Deal v. Mercer Cty. Bd. of Educ., 911 F.3d 183, 189 (4th Cir. 2018). "Plaintiffs need not show that a favorable decision will relieve [their] every injury." Id. (citations omitted). Rather, it is enough that they "show that they personally would benefit in a tangible way from the court's intervention." Id. (citations omitted). "[F]or a plaintiff who is injured or threatened with injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.

Civil penalties can fit that description." Laidlaw, 528 U.S. at 169.

Again, VEPCO highlights the limited reach of Mount Storm's thermal component. In addition, VEPCO points out that it has been working with state agencies to establish a balanced, indigenous population in a 1.2 mile stretch of the Stony River immediately downstream from Mount Storm. The balanced, indigenous population includes 14 species of fish and crayfish, none of which are trout or walleye. Therefore, VEPCO argues, even if Mount Storm did not exist, trout and walleye would not live in the river, so Mr. Meehan's purported injuries would not be redressed by a court order.

Plaintiffs state that brook trout and walleye have lived in the Stony River both before and after the construction of Mount Storm. They argue that two brook trout were found in the Stony River below the dam between 1998 and 2000. A few brook trout were found between 2001 and 2004 and in 2016. Walleye were found in at least 2012, 2015, 2017, and 2020. Plaintiffs argue that lower temperatures would increase the survivability and growth rate of cold-water and cool-water species such as brook trout and walleye, which Mr. Meehan wants to catch. Even if those species were absent, Plaintiffs argue, Mr. Meehan would enjoy fishing for bass in the Mount Storm Lake more if VEPCO complied with the temperature

limit because the bass would be larger at lower temperatures. It would also likely lead to an increase in the size of bass in the Lake, where he already fishes.

In reply, VEPCO states that the question is whether a favorable decision from the Court can reduce the risk to brook trout and walleye in the Stony River such that Mr. Meehan will have a better opportunity to catch them. The brook trout population, VEPCO again argues, was eradicated long before Mount Storm Power Station's construction. In addition, a handful of walleye does not overcome the "overwhelming evidence" that without Mount Storm, brook trout and walleye populations would not be expected to live in the Stony River.

Given that at least some trout and walleye have been found in the Stony River in recent years, and given that it is undisputed that warmer water is detrimental to their survivability, redressability has been established here. Just because trout and walleye are not included in the WVDEP's "balanced, indigenous" population list does not mean that there would not be more of them if the temperature were cooler. If VEPCO complied with temperature restrictions, there would likely be more trout and walleye to fish.

In addition, and as somewhat of a "catch-all," Mr. Meehan's affidavit states, "From reading and talking to fishermen I understand that it is not good to fight a fish in warm water.

16

Trout, particularly, may die if they are caught in water above 65° F. I do not enjoy fishing when I know that the fish I catch may die when I release it." See Response, Exh. F (Meehan Decl.), ECF No. 9-6, at ¶ 18. Therefore, Mr. Meehan's desire to fish for any kind of fish is diminished because he fears that the fish are in poor condition and may die. A court order requiring permit compliance would redress these concerns.

**B.    Abstention**

If the Court finds that Plaintiffs have standing, VEPCO argues that it should exercise its discretion not to hear the case under the Burford abstention doctrine. The Supreme Court has held,

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989). The Burford abstention doctrine is an "extraordinary and narrow exception[] to a federal court's duty to exercise the jurisdiction conferred on it." Martin v. Stewart,

499 F.3d 360, 363 (4th Cir. 2007) (citation omitted).

The parties make a number of arguments as to why the Court should or should not abstain from hearing this case, but they focus on two different cases decided by United States District Judge Irene M. Keeley. VEPCO relies on Jamison v. Longview Power, LLC, 493 F. Supp. 2d 786 (N.D.W. Va. 2007). In that case, the plaintiffs filed a citizen suit, but they were challenging a permitting decision by a state agency. Judge Keeley applied the Burford abstention doctrine, finding that the case was a collateral attack in disguise. Id. at 791.

Conversely, Plaintiffs rely on West Virginia Highlands Conservancy v. Monongahela Power Co., No. 1:11cv71, 2012 WL 11122 (N.D.W. Va. Jan. 3, 2012), in which Judge Keeley found the case to be a "normal" citizen suit and not a disguised collateral attack. She found that Burford abstention was not appropriate because, first, there is no citizen enforcement provision in the West Virginia Water Pollution Control Act, so the plaintiffs would not be able to get "timely and adequate" review of their enforcement claims. Id. at *4. Second, citizen suits under the Clean Water Act do not present "difficult issues of state law bearing on policy problems of substantial public import whose importance transcends the result in the case . . . at bar,' as would warrant Burford abstention." Id. (citing Quackenbush v. Allstate Ins. Co., 517

U.S. 706, 726-27 (1996)). "To the contrary, the regulation of water pollution is a matter of both state *and federal* concern, as evidenced by the cooperative structure" of the state and federal water pollution statutes. Id. Judge Keeley found that the plaintiffs were seeking to enforce, not disrupt, West Virginia's environmental policy by way of their citizen suit. Id. at *5.

In the Mon Power case, Judge Keeley noted that a citizen suit under the Clean Water Act is "brought pursuant to a specific statutory structure which grants federal courts jurisdiction over those claims." Id. (citation omitted). She quoted a case analyzing Burford abstention in the Southern District of West Virginia: "[I]f the Court abstains under the Burford doctrine, thereby not reaching the merits of [the plaintiffs'] arguments, it would be neglecting its duty to ensure that the federal law requirements are complied with, and it would deny Plaintiffs a forum for their citizen enforcement suit." Id. (citing Ohio Valley Env'l Coal., Inc. v. Maple Coal Co., 808 F. Supp. 2d 868, 893 (S.D.W. Va. 2011) (citation omitted).

The Mon Power case, and the cases cited within it, are persuasive. Plaintiffs here are not attempting to attack or disrupt a state agency decision or permit. They are seeking to enforce one. The WVDEP could have implemented an administrative penalty order if it wanted to, which could have precluded the

citizen suit, but it did not do so. The federal statutory scheme is specifically designed for the purposes sought by citizen Plaintiffs here. Part of the purpose of citizen suits is to enable citizens to take action if they are unsatisfied with a lack of government action. For these reasons, Burford abstention is not appropriate here.

## V.  CONCLUSION

For the reasons discussed above, the motion to dismiss is **DENIED** [ECF No. 4].

It is so **ORDERED.**

The Clerk is **DIRECTED** to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: September 22, 2022

*Tom S Kleeh*
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA